# UNITED STATES DISTRICT COURT
for the
Northern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>JOSEPH VINCENT JENKINS<br><br>Defendant(s) | )<br>)<br>) Case No. 5:14-MJ-29 (TWD)<br>)<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __October 4, 2011__ in the county of __Onondaga__ in the __Northern__ District of __New York__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1621(2) | Perjury |

This criminal complaint is based on these facts:


☒ Continued on the attached sheet.

_____
Complainant's signature

Chad J. Willard, Special Agent, Special Agent
_____
Printed name and title

Sworn to before me and signed in my presence.

Date: January 31, 2014

_____
Judge's signature

City and State: Syracuse, NY

Hon. Thérèse Wiley Dancks, U.S. Magistrate Judge
_____
Printed name and title

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Special Agent Chad J. Willard of United States Department of Homeland Security, Homeland Security Investigations (HSI), being duly sworn, depose and state as follows:

1. I am a Special Agent with Immigration and Customs Enforcement (ICE), Homeland Security Investigations, and have been so employed since August 6, 2006. I graduated from the Criminal Investigator Training Program and the ICE Special Agent Training programs at the Federal Law Enforcement Training Center (FLETC) in Glynco, GA. I am currently assigned to the ICE resident agent office in Alexandria Bay, NY. I have participated in investigations involving fraud, alien smuggling, narcotics smuggling, child pornography and intellectual property rights. I have conducted or participated in surveillance, execution of search warrants and debriefing of subjects.

2. This affidavit is made in support of a criminal complaint charging Joseph Vincent JENKINS with violations of Title 18, United States Code, Section 1621(2), perjury.

3. The statements in this affidavit are based in part on my investigation of this matter and on the Criminal Justice Act Form 23, Financial Affidavit of JENKINS. Because this affidavit is being submitted for the limited purpose of securing a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe Joseph Vincent JENKINS did knowingly violate Title 18, United States Code, Section 1621(2).

1

4. On September 12, 2011, a criminal complaint was filed and an arrest warrant was signed by the Honorable Andrew T. Baxter charging Joseph JENKINS with one count of transporting child pornography, in violation of Title 18, United States Code, Section 2252A(a)(1), and one count of possessing child pornography in violation of Title 18, United States Code, Section 2252A(a)(5)(B).

5. On October 4, 2011, JENKINS was arrested and brought before Judge Baxter for an initial appearance on the criminal complaint. At that time, JENKINS completed a Criminal Justice Act Form 23 (CJA 23), Financial Affidavit, in support of his request for assigned counsel. When JENKINS completed Form CJA 23, he certified under penalty of perjury, that all of the information on the form was true and correct. On the CJA 23, JENKINS claimed to be self-employed making $25,000 per year. JENKINS claimed no other income sources. When JENKINS was asked about cash on hand he claimed to have $10,000 in a checking account. JENKINS claimed that his only property asset was a 2003 Dodge Ram which he valued at $8,000. The court reviewed the financial affidavit and found that JENKINS was eligible for assigned counsel. Copies of this CJA 23 financial affidavit are available for the courts inspection upon request.

6. On October 6, 2011, at approximately 5:45 p.m., while JENKINS was housed at the Cayuga Correctional Facility, he had a telephone conversation with his father, George JENKINS, and his mother, Bonita JENKINS, that was audio-recorded. During the telephone conversation, JENKINS instructed his parents to move his money, including cash, IDS accounts, and $37,000 in a Capital One account from JENKINS' name, to his parents' names.

He instructed his parents to move the money in small amounts every couple of days. During the call, the following exchange was recorded:

JENKINS: Ok alright listen to me carefully here cause I don't wanna

FATHER: Yes.

JENKINS: Take up to much time. Ok you need to go to Tim and draw up a power of an attorney so that you can sign for my stuff, do some sort of a power of attorney. FATHER: Ok.

JENKINS: What I want you to do I've got you've gotta start transferring stuff from my name to your name, money, money, IDS accounts, whatever I've got a few accounts with money in them but I gotta get rid of them here, I think

FATHER: Transfer them to my name?

JENKINS: Yeah

FATHER: Ok well ok.

JENKINS: I'll give ya, um, I don't know if I can talk to you but you can write stuff down but, um, there's a Capital One account. I think the checkbook is in the living room, um, and there's probably, I don't know, $37,000 in there that I want you to start transferring to your, into your name.

FATHER: You mean the Cap-that's Capital One right?

JENKINS: There's a checkbook yeah I want you to start writing small checks out and moving the money. Maybe every few days or something.

3

| | |
|---|---|
| FATHER: | Yeah, ok I'll well see Tim on that one ok? Anything else do, do you have numbers on them. The Capital One is where? |
| JENKINS: | Dad I don't have anything with me here the checkbook's in the living room I think I saw it next to the phone. |
| FATHER: | Ok. |
| JENKINS: | That's where I saw it. |
| FATHER: | Ok. |
| JENKINS: | And |
| FATHER: | So anyway my first trip is to Tim to get him to draw up this, uh, power of attorney right? |
| JENKINS: | Right. |

Later in the conversation, JENKINS discusses with his father the benefit of having court-appointed counsel:

| | |
|---|---|
| FATHER: | And I'm waiting for Tim to call you know to see if this lawyer will take the job but you have to tell me it's all up to you on that one. |
| JENKINS: | I don't know if it's worth that kind of money I don't know if the end result is gonna be any different talking to this guy. |
| FATHER: | Well I, I don't know that Joe but it may be worth it, I mean, Christ I don't know how good a lawyer you got but you know I mean he's a, ah, what do you call them, ah |
| MOTHER: | Defense attorney. |
| FATHER: | You know... |

4

JENKINS:    Well he's not a public defender he's private practice, they hired him.

FATHER:     Yeah public defender so, ah...

JENKINS:    Let me, let me get his name it's right here on my card hang on a second, maybe they can check up on him, let me give you the name real quick-Jeffery R. Parry. P-A-R-R-Y.

FATHER:     Ok.

JENKINS and FATHER:   Ok.

JENKINS:    His Number is 315-4XX-XXXX

FATHER:     315-4XX-XXXX

JENKINS:    Yeah maybe they can check up on him. He's private practice he's not

FATHER:     Jeffery R. Parry.

JENKINS:    He doesn't work for the state or anything. If somebody could check up on him that would be nice, so I know

FATHER:     Well, well, we'll try Joe.

JENKINS:    Cause if I can keep him for free, he's talking about hiring experts and everything else so

7.  On October 20, 2011, at 7:27 p.m., in a recorded conversation from Cayuga Correctional Facility, the following exchange occurred between JENKINS and his father:

FATHER:     Well I don't have too much to tell ya today. I mean, we went over to Chris's and, a tomorrow I, and ah, found out (cough) excuse me, we can't touch the IRAs. It's not worth it anyway but the other things I got to talk to your lawyer about

5

|||
|---|---|
| | and to see if it's a good idea. I just have to talk him before I get back to Chris. There's no sense in doing something... |
| JENKINS: | What do you mean it's not worth it? |
| FATHER: | Well, because we don't know what they can do and what they can't do. I'd just a-soon talk it over one-on-one when I'm with you Joe. You follow me? |
| JENKINS: | Alright. |

8. On January 24, 2012, at 6:50 p.m., in a recorded conversation from Cayuga Correctional Facility, the following exchange occurred between JENKINS and his father:

|||
|---|---|
| JENKINS: | My green box in the safe |
| FATHER: | Your green one yes |
| JENKINS: | Ah I don't know how much is in there but uh I wondered if you had ah, ah split up maybe put some of it in a hiding spot somewhere |
| FATHER: | I can do that I can do that |
| JENKINS: | I'm thinking it might be too much in one spot I usually if someone gets into a house it's pretty obvious that were ya know that safe so |
| FATHER: | Right. |
| JENKINS: | So I usually um ya know. |
| FATHER: | I can do that Joe. Yeah I'll do it tomorrow ok? I understand. |

9. As a result of the information learned on the audio-recordings, a federal grand jury issued subpoenas for JENKINS financial records. The United States government is in possession of said financial records.

10. A review of the bank records of Ameriprise Financial Services, Inc. reveals that JENKINS has an "Achiever Circle" portfolio, which includes an Individual Retirement Account (IRA), a Simplified Employee Pension IRA, and other Ameriprise investments. The account began the year 2011 with a balance of $168,380. During the 2011 calendar year, the account had only $1,974 in additions and withdrawals, ending the year with an investment portfolio worth $162,034. As of May 31, 2012, which is the most recent subpoenaed period reported, this account has a balance of $138,673.

11. A review of the bank records of Capital One, N.A. reveals that JENKINS has a High Yield Money Market account in his name. In the beginning of October 2011, the account had a balance of $37,612. At the end of October 2011, the account had a balance of $29,601. As of June 30, 2012, which is the most recent subpoenaed period reported, this account holds a balance of $918.

12. A review of the bank records of First Niagara Bank, N.A. reveals three accounts belonging to Joseph JENKINS. First, JENKINS has a savings account listed in his and his father's name with a current balance of approximately $400; at the time of JENKINS' arrest the account held approximately $400. The second account is a Choice Checking account in JENKINS name individually that had a balance of $3,637 at the time of his initial appearance. As of June 20, 2012, which is the most recent subpoenaed period reported, this account holds a balance of $11,213. The third account is a Free Business Checking account in the name of JENKINS Electric, a business owned by JENKINS. This checking account had a balance of $20,869 at the time of JENKINS initial appearance. As of June 29, 2012, the most recent subpoenaed period reported, this account has a balance of $1,541.

13. A review of New York State Motor Vehicle Records reported by Lexis-Nexis reveals JENKINS is the owner of the following vehicles and vessels:

| | |
|---|---|
| 2008 All-Terrain Vehicle | NYS Plate #: 25YS15 |
| 2003 Dodge Ram 1500 Truck | NYS Plate #: 78367MA |
| 2000 Yamaha 9' Boat | NYS Registration #: 4380UW |
| 1998 Bombardier 17' Boat | Hull Number #: CECA0088A898 |
| Various Trailers | |

## CONCLUSION

14. Based on the foregoing information, there is probable cause to conclude that Joseph V. JENKINS has knowingly committed perjury, in violation of Title 18, United States Code, Section 1621(2).

_____
Chad J. Willard, Special Agent
Homeland Security Investigations
Department of Homeland Security

Sworn and subscribed before me
this 31st day of January, 2014.

_____
HON. THÉRÈSE WILEY DANCKS
UNITED STATES MAGISTRATE JUDGE

8