IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

*******************************************

**UNITED STATES OF AMERICA**          **Criminal Action Number:**

**v.**                               **No. 5:14–CR–0088 EAW**

**JOSEPH JENKINS,**


        **Defendant.**

---

## TRIAL MEMORANDUM OF THE UNITED STATES


Dated: February 23, 2015                Respectfully submitted,

                                        RICHARD S. HARTUNIAN
                                        United States Attorney


                            By:     _/s/ Tamara B. Thomson_
                                    Tamara B. Thomson
                                    Assistant U.S. Attorney
                                    Bar Roll No. 515310

## I. STATEMENT OF THE CASE

A.    Jury selection is scheduled to commence at the discretion of United States District Court, Judge Elizabeth A. Wolford, on March 30, 2015.

B.    JENKINS is detained and is currently serving a 225 month sentence in connection with a judgment of conviction in the matter *United States v. Jenkins*, 5:11-cr-00602(GTS).

C.    A jury trial has not been waived.

D.    The estimated duration of trial is approximately three (3) days.

E.    The single-count indictment charges JENKINS with perjury in violation of 18 U.S.C. § 1621(2). The matter arises from a Criminal Justice Act Form 23, Financial Affidavit ("CJA 23 Form") completed by JENKINS in connection with a separate criminal proceeding.

## II. STATEMENT OF FACTS

**A.    Prior Proceedings Giving Rise to Perjurious Statements**

On September 12, 2011, a criminal complaint was filed and an arrest warrant was signed by the Honorable Andrew T. Baxter charging defendant Joseph Jenkins with one count of transporting child pornography, in violation of Title 18, United States Code, Section 2252A(a)(1), and one count of possessing child pornography in violation of Title 18, United States Code, Section 2252A(a)(5)(B).[1]   On October 4, 2011, Jenkins was arrested and brought before Judge Baxter for an initial appearance on the criminal complaint.  At that time, Jenkins

---

[1] On December 21, 2011, a federal grand jury returned an indictment charging the Defendant with one count of transporting child pornography in violation of Title 18, United States Code, Section 2252A(a)(1), and one count of possessing child pornography in violation of Title 18, United States Code, Section 2252A(a)(5)(B).  On February 6, 2014, the Defendant was convicted by a jury of both counts.

completed a Criminal Justice Act[2] Form 23, Financial Affidavit ("CJA Affidavit"), certified under penalty of perjury, in support of his request for assigned counsel.

The CJA Affidavit required the Defendant to disclose his assets and liabilities to determine his ability or inability to pay for counsel.  On the CJA Affidavit, in the section bracketed as "assets," the Defendant was asked a series of "yes" or "no" questions, with corresponding lines to explain as needed.  The questions regarding assets are divided into four sections:  employment, other income, cash and property.  In the first section, the Defendant was asked if he was employed; the name and address of his employer; and how much he earned per month.  The Defendant indicated he was self-employed and earned $25,000 yearly.  In the next section the Defendant was asked about any other income from a business, profession, or other form of self-employment, or in the form of rent payments, interest, dividends, retirement or annuity payments, or other sources.  The Defendant did not write any information in this section. In the next section, the Defendant was asked about cash, specifically "[h]ave you any cash on hand or money in savings or checking account (sic)" and the Defendant checked the "yes" box and indicated that he had a total amount of "$10,000."   In the last section under assets, the Defendant was asked "[d]o you own any real estate, stocks, bonds, notes, automobiles, or other valuable property (excluding ordinary household furnishings and clothing?)"  The Defendant handwrote in "2003 Dodge Ram" and estimated the value to be "$8,000."  The government

_____

[2] The Criminal Justice Act ("CJA"), Title 18 United States Code, Section 3006A, mandates that each United States district court have in place a plan for furnishing representation for any person financially unable to obtain adequate representation.  *See* 18 U.S.C. § 3006(a).  Pursuant to the CJA guidelines, determination of eligibility is up to the court.  *See* United States Courts, Guidelines for Administering the CJA and Related Statutes, Section 210.40.20.  The form used by the court to determine eligibility for assigned counsel is the Form CJA-23, Financial Affidavit.  All relevant information bearing on the person's financial eligibility should be reflected on the form.  *See id.* at § 210.40.20(d).

contends that these answers were false, as they failed to accurately disclose the Defendant's assets.

Judge Baxter reviewed the CJA Affidavit and, based on the information provided found the Defendant eligible for assigned counsel.[3]

**B.      Jenkins's Efforts To Hide His Assets**

On October 6, 2011, two days after Jenkins was appointed counsel and while he was housed at the Cayuga Correctional Facility, Jenkins had a telephone conversation with his father, George Jenkins, and his mother, Bonita Jenkins, that was audio-recorded.[4]  During the telephone conversation, Jenkins instructed his parents to move his money, including cash, IDS accounts, and $37,000 in a Capital One account from Jenkins' name, to his parents' names.  He instructed his parents to move the money in small amounts every couple of days:

| JENKINS: | Ok, alright.  Well, listen to me carefully here cause I don't wanna take up |
| FATHER: | Yes. |
| JENKINS: | too much time. |
| FATHER: | Ok. |
| JENKINS: | You, you need to go to Tim and draw up a power of an attorney so that you can sign for my stuff.  Do some sort of a power of attorney. |
| FATHER: | Ok. |

---

[3] The October 4, 2011 initial appearance was audio-recorded, but the recording was not activated until almost two minutes into the proceedings.

[4] The government has previously produced transcripts of these calls, including as recently as on February 17, 2015.

JENKINS:      What I want you to do, I've got, you've gotta start transferring stuff from my name to your name.   Money, money, IDS accounts, whatever.  I've got a few accounts with money in them, but I gotta get rid of them here, I think.

FATHER:       Transfer them to my name?

JENKINS:      Yeah.

FATHER:       Ok, well ok.

JENKINS:      I'll give ya, um, I don't know if I can talk to you but you can write stuff down, but, um there's a Capital One account.  I think the checkbook is in the living room.  Um, and there's probably, I don't know $37,000 in there that I want you to start transferring to your, into your name.  Cap…

FATHER:       You mean the Cap… that's Capital One right?

JENKINS:      There's a checkbook, yeah I want you to start writing small checks out and moving the money, maybe every few days or something.

FATHER:       Yeah, ok, well I'll see Tim on that one, ok?  Anything else?  Do, do you have numbers on them?  The Capital One is where?

JENKINS:      Look (unintelligible) I don't have anything with me here.   The checkbook's in the living room.  I think I saw it next to the phone.

FATHER:       Ok.

JENKINS:      That's where I saw it.

FATHER:       Ok.

JENKINS:      And

FATHER:      So anyway my first trip is to Tim to get up, draw up this, uh

power of attorney right?

JENKINS:     Right.

Later in the same conversation, the Defendant discusses with his father the benefit of having court-appointed counsel:

FATHER:      And I'm waiting for Tim to call, you know, to see if this lawyer

will take the job but you have to tell me.  It's all up to you on

that one.

JENKINS:     I don't know if it's worth that kind of money.  I don't know if the

end result is gonna be any different than talking to this guy.

FATHER:      Well I, I don't know that Joe but it may be worth it, I mean,

Christ.  I don't know how good a lawyer you got but, you know, I mean

he's a, ah, what do you call them?

MOTHER:      Defense attorney.

FATHER:      From the, you know?

JENKINS:     Well he's not a public defender, he's private practice.  They hired him.

FATHER:      Yeah public defender.  So, ah...

JENKINS:     Let me, hang on, let me get his name.  It's right here on my card.  Hang on

a second.  Maybe they can check up on him.  Let me give you the name

real quick.

FATHER:      Ok.

JENKINS:     Jeffery R. Parry.  P-A-R-R-Y.

FATHER:      Ok.

JENKINS:        And

FATHER:         Ok.

JENKINS:        His Number is 315-424-6115

FATHER:         315-424-6115

JENKINS:        Yeah.  Maybe they can check up on him.  He's private practice, he's not

FATHER:         Jeffery R. Parry.

JENKINS:        He doesn't work for the state or anything.  But if somebody could check up on him that would be nice, so I know.

FATHER:         Well, well, we'll try Joe.

JENKINS:        Cause if I can keep him for free, he's talking about hiring experts and everything else so.

On October 20, 2011, at 7:27 p.m., in a recorded conversation from Cayuga Correctional Facility, Jenkins's father expressed misgivings to Jenkins about the proposal to move money:

FATHER:         Well I don't have too much to tell ya today. I mean.  We went over to Chris's and uh, tomorrow I gotta, and ah found out (cough) excuse me, I can't touch the IRAs.  It's not worth it anyway.  But the other things I got to talk to your lawyer about and to see if it's a good idea.  Uh, I just have to talk him before I get back to Chris.

JENKINS:        What do you…

FATHER:         There's no sense in doing something.

JENKINS:        What do you mean it's not worth it?

FATHER:     Well, because we don't know what they can do and what they can't do. I'd just assume talk it over one-on-one when I'm with you Joe.  You follow me?

JENKINS:    Alright.

On January 24, 2012, at 6:50 p.m., in a recorded conversation from Cayuga Correctional Facility, Jenkins gave his father additional instructions about locating and hiding his (Jenkins's) assets:

JENKINS:    My green box in the safe.

FATHER:     Your green one, yes?

JENKINS:    Ah, I don't know how much is in there, but, uh I wonder if you oughta, uh split up, maybe put some of it in a hiding spot somewheres?

FATHER:     I can do that.  I can do that.

JENKINS:    I'm thinking it might be too much in one spot.  I usually, if someone gets into a house it's pretty obvious that, where ya know, that safe so

FATHER:     Right.

JENKINS:    So I usually, um, ya know.

FATHER:     I can do that Joe.  Yeah I'll do it tomorrow, ok?  I understand.

As a result of the information disclosed on the audio recordings, a federal grand jury issued subpoenas for the Defendant's financial records.   Those records confirmed the Defendant's deception in the CJA Affidavit, as they evinced that he had substantially more assets than what he disclosed (which was limited to $10,000 and the 2003 Dodge Ram).

Bank records of Ameriprise Financial Services, Inc. revealed that the Defendant has an account, which includes an Individual Retirement Account (IRA), a Simplified Employee

Pension IRA, and other Ameriprise investments.  The account began the year 2011 with a balance of $168,380 and ended the year with an investment portfolio worth $162,034.[5]

Bank records from Capital One, N.A. confirmed that the Defendant has a High Yield Money Market account in his name.  In the beginning of October 2011, the account had a balance of $37,612.08.   At the end of October 2011 – immediately after Jenkins instructed his father to start moving his money – the account had a balance of $29,601.  In December 2011, the account had a balance of $19,181.53.

The bank records of First Niagara Bank, N.A. reflect that the Defendant has three accounts.  First, he has a savings account which held approximately $400 at the time of his initial appearance.  The second account is a Choice Checking account in Jenkins's name individually that had a balance of $3,637 at the time of his initial appearance.  The third account is a Free Business Checking account in the name of Jenkins Electric, a business owned by the Defendant. This checking account had a balance of $20,869 at the time of the Defendant's initial appearance.

Further, evidence obtained after the Defendant subscribed to the CJA Affidavit indicates that he had additional valuable property that he failed to disclose.  New York State Motor Vehicle Records reveal that the Defendant owned the following vehicles and vessels at the time of his initial appearance:

| | |
|---|---|
| 2008 All-Terrain Vehicle | NYS Plate #: 25YS15 |
| 2003 Dodge Ram 1500 Truck | NYS Plate #: 78367MA |
| 2000 Yamaha 9' Boat | NYS Registration #: 4380UW |

---

[5] The Ameriprise portfolio includes an "Ameriprise One Financial Account," which is an account with check-writing privileges.  The "cash equivalents" portion of this account at the beginning of 2011 was $47,787.09 and the value at the end of 2011 was $45,764.00.

1998 Bombardier 17' Boat                    Hull Number #: CECA0088A898

Those same DMV records indicate that the Defendant also owned various trailers.  Of these, the only vehicle that the Defendant disclosed on the CJA Affidavit was his Dodge truck.

## III. STATEMENT OF THE LAW

**A.      The Substantive Offense: Perjury**

The single-count Indictment charges JENKINS with perjury in violation of 18 U.S.C. § 1621(2).  Section 1621(2) provides as follows:  "Whoever ... in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true ... is guilty of perjury...."  18 U.S.C. § 1621(2).   A person commits perjury under this statute "'if he gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory.' " *United States v. Friedman,* 998 F.2d 53, 58 (2d Cir.1993) (quoting *United States v. Dunnigan,* 507 U.S. 87, 94 (1993)).

The evidence at trial will establish the elements of the offense.  With respect to the requirement that the statements at issue be given under oath, the CJA Affidavit makes clear that Defendant "certif[ied] under penalty of perjury that the foregoing is true and correct."  *See United States v. Harris*, 707 F.2d 653, 658 (2d Cir. 1983) ("false statements in an application for counsel under the [Criminal Justice] Act are subject to the penalties of perjury") (citing *United States v. Birrell*, 470 F.2d 113 (2d Cir. 1972)); *United States v. Venator*, 568 F. Supp. 832, 836 (N.D.N.Y. 1983) (noting that CJA Affidavit would be unsealed following trial on charge for which defendant was appointed counsel so that the government could evaluate whether to pursue

"a perjury prosecution against defendant if it is determined that he has obtained appointed counsel through untruthful financial affidavits").

In addition, the evidence will make clear that the statements were false at the time they were made. Specifically, Defendant swore that his assets were limited to the $10,000 in his accounts and his Dodge truck, when his assets at the time, as confirmed by his bank and DMV records, were substantially greater.[6]

The evidence will also show that the statements were material to the decision whether to afford the Defendant appointed counsel. For purposes of materiality, the question in this case is not whether the Defendant would have been appointed counsel but-for his deception; but rather whether his false information was relevant to the question under consideration. As Judge Friendly explained long ago:

> It is clear, however, that a misstatement of fact does not need to be dispositive of the inquiry in question to be "material" within the meaning of § 1621. Rather "it must be shown that a truthful answer would have been of sufficient probative importance to the inquiry so that, as a minimum, further fruitful investigation would have occurred."

*United Stated v. Birrell*, 470 F.2d 113, 115 n.1 (2d Cir. 1972) (quoting *United States v. Freedman*, 445 F.2d 1220, 1227 (2 Cir. 1971)). In this case, there can be little doubt as to the materiality of the statements insofar as they were included in the affidavit designed to provide Judge Baxter with information necessary to determine qualification for appointment of counsel.

---

[6] The so-called "two witness" rule for perjury cases – *i.e.*, that when falsity is proven by testimony, the testimony must be from at least two witnesses – does not apply here, where falsity is reflected in direct documentary evidence. *See United States v. Collins*, 272 F.2d 650, 652 (2d Cir. 1959) (holding that two-witness rule did not apply to allegation that defendant lied about the timing of union meeting minutes where proof of falsity was based on documentary evidence that typewriter used to create the minutes did not exist at the time that defendant claimed minutes were created).

Finally, the government will also present evidence at trial that the Defendant's statements were willfully false. "In the absence of an admission by the defendant, the only way a defendant's knowledge of the falsity of his statements can be proved is through circumstantial evidence." *United States v. Sweig,* 441 F.2d 114, 117 (2d Cir. 1971). Willfulness may be inferred "from proof of the objective falsity itself, proof of a motive to lie, and from other facts tending to show that the defendant really knew the things he claimed not to know." *Id.* In this case, there is ample evidence that the Defendant's deceit was willful – not the least of which are the numerous recorded phone calls where the Defendant directed his father to transfer (and hide) his sizable financial assets. *See id.* at 117-18 (holding that evidence of defendant's familiarity with matters as to which he denied knowledge in grand jury testimony supported finding that he willfully lied).

**B.     The Perjury Indictment Is Not Based on Fundamentally Ambiguous Questions**

Defendant previously filed a motion to strike the indictment on the basis that the questions posed in the CJA Affidavit were "fundamentally ambiguous" and could not sustain a perjury conviction. (Dkt. No. 15.) This Court correctly rejected that motion, finding that "the context of the questions was plainly seeking the identity of Defendant's 'assets' on a 'financial affidavit' so that a determination could be made about Defendant's 'ability to pay' or whether he should be appointed counsel 'without payment of fee.'" (Dkt. No. 23 at 11.) The Court further ruled that any ambiguity as to the information sought in the financial affidavit would be for the jury to resolve at trial. *Id.*

The government will present evidence at trial making clear that the questions posed were not fundamentally ambiguous, and that the Defendant's answers in the financial affidavit were false under any reasonable interpretation. A question is "fundamentally ambiguous" only when

it "is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony." *See United States v. Lighte*, 782 F.2d 367, 375 (2d Cir. 1986) (*quoting United States v. Lattimore*, 127 F.Supp. 405, 410 (D.C.D.C. 1955)).  The question at issue cannot be viewed in isolation, but rather must be considered in the context in which it was asked.  *See United States v. Bonacorsa*, 528 F.2d 1218, 1221 (2d. Cir. 1976) ("A defense to a charge of perjury may not be established by isolating a statement from context, giving it in this manner a meaning entirely different from that which it has when the testimony is considered as a whole."); *Lighte*, 782 F.2d at 373 ("In determining the meaning that a declarant gives to a question, a jury need not examine isolated segments of the question and answer exchange, but may view it within the context of the entire line of questioning.").

The defendant's interpretation of a question is not viewed subjectively; the test is an objective one where the jury determines "whether the question – as the declarant must have understood it, giving it a reasonable reading – was falsely answered." *Lighte*, 782 F.2d at 372. "'If the response given was false as the defendant understood the question, his conviction is not invalidated by the fact that his answer to the question might generate a number of different interpretations.'" *Id.* at 375 (quoting *United States v. Williams*, 552 F.2d 226, 229 (8th Cir.1977)).  Moreover, a jury "may also consider extrinsic evidence that demonstrates how a declarant interpreted a question." *Id.*  In this case, the evidence will allow the jury to assess for itself whether the questions posed in the CJA Affidavit sought the disclosure of all of the Defendant's relevant assets – as the government contends – or whether they sought only cherry-

picked information that grossly understated the Defendant's net worth – as the Defendant apparently contends.

## IV. EVIDENTIARY ISSUES

### A.    Audio Recordings and Transcripts

The government will offer into evidence portions of audio recordings of conversations that occurred on October 6, 2011, October 20, 2011 and January 24, 2012, while the Defendant was in custody at the Cayuga County Jail.[7]  The portions of the calls that the government intends to introduce are relevant to the Defendant's knowledge of his assets, the falsity of the information he provided in the CJA Affidavit, and the Defendant's willfulness in providing that false information.  Specifically, they throw into sharp relief the Defendant's efforts to secrete his assets, shortly after swearing (falsely) that such assets did not exist.

The Defendant's recorded telephone conversations are admissible as a party opponent admission under Fed. R. Evid. 801(d)(2).[8]  *See, e.g.*, *United States v. Meskini*, 319 F.3d 88, 93 (2d Cir. 2003); *United States v. Inserra*, 34 F.3d 83, 90 (2d Cir. 1994).  Moreover, there can be no reasonable dispute as to their authenticity.  As the Second Circuit has explained: "[t]he government is not required to call as a witness a participant in a recorded conversation in order to authenticate the recording; it may lay the foundation for the recording through the testimony of the technician who actually made it."  *United States v. Barone*, 913 F.2d 46, 49 (2d Cir. 1990); *see also United States v. Fuentes*, 563 F.2d 527, 532 (2d Cir. 1977) ("There simply is no

---

[7] Transcripts of these calls have been previously disclosed on multiple occasions, including most recently on February 17, 2015, pursuant to the Amended Pre-Trial Order in this case.

[8] The recordings of the other participants in the calls – *i.e.,* the Defendant's father and mother – are not hearsay because they "are not presented for the truth of the matter asserted, but only to establish a context for the recorded statements of the accused…"  *United States v. Barone*, 913 F.2d 46, 49 (2d Cir. 1990).

requirement that the tapes be put in evidence through the person wearing the recorder or, for that matter, through a contemporaneous witness to the recorded conversations").

In this case, the government intends to call an officer from the Cayuga County Correctional Facility, who will explain the process of recording calls at the facility.[9]   The identity of the participants in the phone conversation can be established in various ways, including through a witness who has previously heard the participants' voices, *see United States v. Albergo*, 539 F.2d 860, 863-64 (2d Cir. 1976) (allowing agent to identify voices of speakers on tape based on prior experience with speakers), or through circumstances reasonably evincing the speakers' identities, *see O'Neal v. Esty*, 637 F.2d 846, 850 (2d Cir. 1980) (declarant's self-identification on a recording was sufficient where the recorded call was placed to the number where declarant was expected to be).   In this case, given that the calls were placed using Jenkins's jail account and the participants identified themselves on the recording, the identity of the participants is easily established.

Notably, a number of these same jail-call recordings were admitted into evidence in the Defendant's prior trial on the child-pornography charge.   The same result should apply here.

**B.   Bank Statements: FRE 803(6) and 807**

At trial, the government intends to offer in its case-in-chief the bank statements from Ameriprise Financial Services, Capital One, N.A., and First Niagara Bank N.A. as evidence of the assets that Defendant concealed when he executed the CJA Affidavit.   These exhibits are listed on the government's exhibit list and have been disclosed to the Defendant.

---

[9] The government need not prove chain of custody for the admissibility of audio recordings.  *See United States v. Steinberg*, 551 F.2d 510, 515 (2d Cir. 1977) ("[A]ppellant Steinberg urges that the government should have been required to prove the chain of possession of the tape recordings from the time they were made to the time of trial. No statute or court rule imposes such a burden on the government, and the testimony of [the agent] as to the authenticity and accuracy of the tapes laid a sufficient foundation for their admission.")

The bank records are clearly relevant to this case, insofar as they identify the assets that the government contends were deliberately concealed when the Defendant completed the CJA Affidavit.  Moreover, they are admissible as business records pursuant to Fed. R. Evid. 803(6).  *See United States v. Williams*, 205 F.3d 23, 34-35 (2d Cir. 2000) (affirming admission of bank records because "Rule 803(6) 'favor[s] the admission of evidence rather than its exclusion if it has any probative value at all'") (*citing In re Ollag Const. Equip. Corp.*, 665 F.2d 43, 46 (2d Cir. 1981)).  The government will be prepared to call the appropriate business records custodian, and/or to present a certification pursuant to Fed. R. Evid. 902(11), establishing the requisite elements of Rule 803(6) with respect to each proffered exhibit.[10]

C.     **New York State Motor Vehicle Records – Rule 803(8)**

The government also intends to offer New York State Motor Vehicle Records confirming that Defendant owned an all-terrain vehicle, two boats and various trailers that he did not disclose in the CJA Affidavit.  These exhibits are listed on the government's exhibit list and have been disclosed to the Defendant.  They are admissible pursuant to Fed. R. Evid. 803(8) as public records, and are self-authenticating pursuant to Fed. R. Evid. 902(4).  *See Felzcerek v. I.N.S.*, 75 F.3d 112, 116 (2d Cir. 1996) (noting that DMV application was admissible as a public record and explaining that "the business and public records exceptions would seem to be among the safest of hearsay exceptions") (quoting *Ohio v. Roberts*, 448 U.S. 56, 66 n. 8 (1980)).[11]

---

[10] These exhibits are also admissible pursuant to the residual exception of Fed. R. Evid. 807 as they (1) have sufficient guarantees of trustworthiness; (2) are evidence of a material fact; (3) are more probative of the point for which they are offered than any other evidence that may be obtained through reasonable efforts; and (4) admission will best serve the purposes of the federal rules and the interests of justice.

[11] These exhibits are also admissible pursuant to the residual exception of Fed. R. Evid. 807 as they (1) have sufficient guarantees of trustworthiness; (2) are evidence of a material fact; (3) are more probative of the point for which they are offered than any other evidence that may be

D.     **Rule 404(b) Evidence**

The government reserves the right to, and hereby provides notice of its intention to, seek admission of evidence, pursuant to Fed. R. Evid. 404(b), of the following:  that when the Defendant met with United States Probation Officer Ellen Phillips on October 4, 2011, at 12:30 p.m., the Defendant once again lied about his assets (as he did on the CJA affidavit).  The Defendant met with Probation Officer Phillips in connection with her preparation of a Pre-Trial Services Report.  At that time, the Defendant disclosed that he had two checking accounts:  one account having a $3,000 balance and one checking account having a balance between $10,000 to $12,000.  The Defendant denied having any other stocks, bonds, cash, savings or retirement accounts.[12]

Rule 404(b) allows for the admission of evidence of other crimes, wrongs or acts in order to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  The Second Circuit applies a four-factor test in assessing admissibility of 404(b) evidence:  "whether: (1) the prior act evidence was offered for a proper purpose; (2) the evidence was relevant to a disputed issue; (3) the probative value of the prior act evidence substantially outweighed the danger of its unfair prejudice; and (4) the court administered an appropriate limiting instruction."  *United States v.* Cadet, 664 F.3d 27, 32 (2d Cir. 2011) (quoting *United States v. Garcia*, 291 F.3d 127, 136 (2d.Cir.2002)).

Here, the evidence of Defendant's continued deception in describing to the probation officer his assets evinces, among other things, his knowledge, absence of mistake and lack of accident with respect to the misrepresentations giving rise to the perjury charge.  Even after

---

obtained through reasonable efforts; and (4) admission will best serve the purposes of the federal rules and the interests of justice.
[12] Probation Officer Phillips has been identified on the government's witness list.

having time to reflect on the statements he made in the CJA Affidavit, Defendant continued to lie about his wealth.  *See United States v. Jones*, 900 F.2d 512, 520-21 (2d Cir. 1990) (holding that district court properly admitted at perjury trial evidence of other examples of defendant's false statements in order to refute defendant's defense of a faulty memory); *United States v. White*, 531 F. App'x. 101, 102 (2d Cir. 2013) (holding that district court properly admitted under Rule 404(b) defendant's prior statements of his veteran status as evidence of knowledge or intent in prosecution for defendant's false statement that he was entitled to veterans' preference for government contracts).

## V. CONCLUSION

The government respectfully submits this trial memorandum and requests the admission of the above-referenced evidence.  The government reserves its right to submit further briefing as may become necessary.